UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------X
DONALD J. BERNHARDT,

          Plaintiff,

          -against-

INTERBANK OF NEW YORK,
DIMITRI CONTOMINAS, and
GEORGE L. KELLEY, JR.,

          Defendants.
----------------------------------------------------X

**AMENDED MEMORANDUM & ORDER**

92 CV 4550

DEARIE, Chief Judge.

This Amended Memorandum and Order amends and supersedes the Memorandum and Order dated September 25, 1998 issued in this matter, 18 F. Supp. 2d 218, 1998 U.S. Dist. LEXIS 15066, only insofar as it deletes certain references to background material not pertinent to the discussion or result.

Plaintiff Donald Bernhardt claims that he was fired from his position as Chief Operating Officer of Interbank of New York in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"), Title VII, 42 U.S.C. § 2000e et seq. and New York Executive Law § 296 et seq.. All defendants seek summary judgment and individual defendants also seek Rule 12 dismissal of the claims against them on the ground that there is no individual liability under Title VII or the ADEA. Defendants have also moved to sever the damages phase from the liability phase of the trial pursuant to Federal Rule of Civil Procedure 42(b).

## BACKGROUND

The plaintiff is 61 years old. He has spent his career working as a banker. Over the course of his career he developed expertise in securing New York State Bank licenses for foreign banks. In November of 1988, he was approached by Mr. Stylianos Zavvos, a 35-year-old Greek national, about a position at the then fledgling Interbank of New York ("Interbank" or "Bank"). Mr. Zavvos had himself been hired by Mr. Contominas, a Greek national, who was the Chairman and principal stockholder of Interbank. In April of 1989, at the age of 52, plaintiff was hired as Chief Operating Officer ("COO") of Interbank.

### A. Setting up the Bank

*1. Securing a License*

Shortly after he joined Interbank, the plaintiff learned that Interbank's initial application for a license had been refused by the banking regulators. This application had listed Zavvos as President, and was rejected on the grounds that Zavvos lacked the necessary experience. Interbank then hired Mr. John Manos, a 61-year-old Greek American and an experienced banker, as President and CEO of Interbank. Mr. Zavvos was given the title of Executive Vice President/Business Development. The Bank was granted a license on September 24, 1990.

*2. Staffing the Bank*

The three executives were responsible for staffing the bank. According to the plaintiff, Mr. Contominas directed them to hire young Greek men. Mr. Zavvos repeated Mr. Contominas' direction, adding that "greek people like to see young people [with] the 'Athenians Look' [sic], rather than old people." (Compl. P 37). The plaintiff alleges that Mr. Contominas had adopted a similar hiring policy in his insurance business, as he believed that young Greeks were eager to

work for very little money and would do what they were told without question.

Despite this stated preference for young male Greeks, the plaintiff and Mr. Manos hired Cathy Safos, a middle aged woman, for the position of Assistant Operations Officer. According to the plaintiff, Mr. Contominas and Mr. Zavvos objected, as she was "older and less dynamic then [sic] they wanted for Interbank." Ms. Safos worked for Interbank until 1994. The plaintiff and Mr. Manos hired Irene Markotsis, also a middle-aged woman, to be Interbank's Lending Officer. Mr. Zavvos and Mr. Contominas complained that she lacked "the young Greek 'Athenian Look.'" Ms. Markotsis also worked for Interbank until 1994.

*3. Quarreling*

Tensions developed among the three executives during the initial period. According to the plaintiff, when Zavvos was denied the title of President he insisted that he have the President's office or an office of comparable size and spent additional construction money to enlarge his office. The plaintiff alleges that Zavvos and Manos nearly came to blows over this issue. Plaintiff observes that "it was constantly arguments. There was never a peaceful day in the bank, never."

**B. Operating the Bank**

In December 1990, Interbank celebrated the opening of its new offices. At the opening ceremonies, Mr. Contominas introduced the plaintiff, praising him as the man who had made his dream of Interbank come true.

*1. Losses*

Despite this dream, Interbank operated at a loss during the first quarter of 1991. The pre-opening and advertising expenses had been greater that projected and income from loan

interest was disappointing. At the April 30th meeting, the board minutes note that earnings were insufficient to cover operating expenses and that the Bank's quarterly losses were $59 million greater than the budgeted loss of $399 million. At the May board meeting, a member of the Advisory Board, "indicated that the future outlook of the Bank was bleak unless immediate steps were taken to increase our loan growth and curtail expenses."

According to the plaintiff, new banks generally operate at a loss for at least the first three years. He alleges that the Bank's board members knew that Interbank would not be profitable for the first three years. In support of this assertion, the plaintiff points to notes from the January 28, 1991 board meeting at which representatives from FDIC "advised the board against paying director fees for the first three years or until the Bank reached a break even point, whichever occurred first."

*2. Management Conflict*

According to the testimony of Mr. Madouros, an Interbank board member, the three executives were so at odds with one another on issues of policy that they were unable to cooperate sufficiently to establish a mortgage brokerage department. Each of the three managers called Mr. Madouros, insisting that the other managers be fired. The staff splintered into camps, aligning themselves with individual managers.

Plaintiff admits that there was internal conflict among the three executives. According to the plaintiff, however, Zavvos was the source of much of the conflict, interfering with the chain of command and criticizing the plaintiff to board members: "and it was constant bickering . . . and friction and conflict was every day there."

*3. Plaintiff's Performance*

Defendants claim that the plaintiff's performance was unsatisfactory. Mr. Madouros testified that he was rude, unprofessional and difficult to work for. In addition, plaintiff was absent from the bank due to health problems from February 9, 1991, through "sometime in April." Defendants asserts that this absence was particularly problematic because, as Chief Operating Officer, his presence was necessary for the bank to function smoothly. Plaintiff also disagreed with the board on investment strategies for the Bank.

However, when the plaintiff heard a rumor in April that he was going to be fired, he claims that Mr. Contominas called him, reassured him that it was only a rumor and commended him on his work. The plaintiff also claims that an Interbank board member told plaintiff that he "had done a great deal for the bank." Finally, when Interbank's board met on May 23, 1991 to elect officers, the plaintiff was unanimously re-elected to his position.

## C. Termination and Replacement

The plaintiff was fired one month later. He was 54 years old. He immediately called Mr. Manos, who told him that he had been fired because "they are looking for a younger person."[1] The plaintiff also telephoned Kevin Barnard, Interbank's counsel. The plaintiff claims that Mr. Barnard told him that he had attended a meeting with a search firm and Mr. Contominas's attorney, Mr. Kelley. Mr. Barnard told the plaintiff that the search firm was asked "to get

---

[1] John Manos is deceased. Plaintiff submitted a deposition of Mr. Manos taken on December 1, 1992 in Manos's own case against Interbank in New York Supreme Court. Manos testified that he had lunch with Kevin Barnard and that they talked about a "how Donald Bernhardt was mistreated, that he was let go because of his illnesses and absences due to illness from the bank, that he did not have a Greek profile."

someone that was Greek speaking, someone who had international banking experience who could do [plaintiff's] job and at the same time be at the bank for 20 years or more, a younger person."

The plaintiff also claims that after he was fired he spoke with a banking acquaintance, Mr. Charles Marolla, who had interviewed for the COO position before the plaintiff had been fired. He told the plaintiff that he had been rejected by the search firm, despite his experience as president of a bank, because he was too old and not of Greek ancestry.

In July of 1991, Interbank hired Deno Remoundos, a 40-year-old Greek American. Defendants claim that Mr. Remoundos was hired to replace Mr. Manos, whom the board decided to replace as President and CEO on July 29, 1991. Mr. Manos was ultimately fired on September 26, 1991. At about that time, Mr. Remoundos was appointed President and CEO of Interbank. Also in September, Peter Wolford, a 43-year-old non-Greek American, was hired as Chief Operating Officer.

## DISCUSSION

A motion for summary judgment should be granted only where "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). In evaluating these motions, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." Matsushita Electric. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962)). In the employment discrimination context, the Second Circuit has stated that summary judgment for the employer is appropriate "only if

evidence of discriminatory intent is so slight that no rational jury could find in plaintiff's favor." Viola v. Philips Medical Systems of North America, 42 F.3d 712, 716 (2d Cir. 1994). At the same time, however, the existence of a factual dispute alone is insufficient to defeat a motion for summary judgment; the non-moving party must offer affirmative evidence tending to support its position. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). Summary judgment may be entered against any party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 321, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).

## A. Title VII and ADEA Discrimination[2]

A claim of discrimination brought under Title VII or the ADEA is evaluated by means of the three-step framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). See also Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981); Transworld Airlines, Inc. v. Thurston, 469 U.S. 111, 121, 83 L. Ed. 2d 523, 105 S. Ct. 613 (1985); Woroski v. Nashua Corp., 31 F.3d 105, 108 (2d Cir. 1994). Following this framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination. Burdine, 450 U.S. at 252. If the plaintiff establishes a prima facie case, a presumption is created that the employer

---

[2] Claims under New York Human Rights law are subject to the same analysis as those brought under Title VII and the ADEA. See Song v. Ives Laboratories, Inc., 957 F.2d 1041, 1046 (2d Cir. 1992) (New York courts have adopted Title VII analysis for N.Y. Exec. Law § 296 claims); Kennel v. Dover Garage, Inc., 816 F. Supp. 178 (E.D.N.Y. 1993) (age discrimination claim under N.Y.Exec. Law § 296 et seq. may be analyzed according to same legal precepts governing ADEA claims).

unlawfully discriminated against the plaintiff. Id., at 254. An employer can rebut this presumption by offering "a legitimate, nondiscriminatory reason" for its adverse employment action. Id. If the employer comes forth with such a reason, the plaintiff must then produce evidence sufficient to create a genuine issue of fact "as to whether (1) the employer's asserted reason for discharge is false . . . and (2) more likely than not, the employee's [age or national origin] was the real reason for the discharge." Woroski, 31 F.3d at 110.

*1. Prima Facie Case*

The defendants argue that summary judgment is appropriate because the plaintiff has failed to make out a prima facie case of age or national origin discrimination. To make out a prima facie case of age discrimination, the plaintiff must show: (1) that he was a member of a protected class; (2) that he was qualified for the position; (3) that the employer took adverse action; and (4) that the action occurred under circumstances giving rise to an inference of discrimination. Woroski, 31 F.3d at 108.

The first three elements of a prima facie case of national origin discrimination are the same as those for age discrimination. The fourth element requires the plaintiff to show that either the position remained open or he was replaced by someone not a member of his protected class. De la Cruz v. N.Y. City Human Res. Admin. DSS, 82 F.3d 16, 20 (2d Cir. 1996).

As to both the age and national origin discrimination claims, the defendants argue that the plaintiff has failed to establish the third element: that he was qualified for his position. Citing this Court's decision in Duffy v. State Farm Mutual, 927 F. Supp. 587, 594 (E.D.N.Y. 1996), defendants assert that plaintiff failed to "prove that [his] performance was of sufficient quality to merit continued employment." In Duffy, however, this Court found that the plaintiff had

established a prima facie case of discrimination, emphasizing that a plaintiff bears only a de minimis burden in establishing a prima facie case. Id. Here, Mr. Bernhardt has more than met that burden. He not only had decades of experience in banking, but many of those years were spent establishing new banks. At the Bank's opening, Mr. Contominas credited the plaintiff with making his dream of Interbank come true. Finally, his performance was of a sufficient quality for Interbank's board to re-elect him a month before he was fired.

Defendants argue that the plaintiff also failed to establish the fourth element of his national origin claim, that he was replaced by someone not a member of his protected class. Defendants argue that Philip Wolford, a non-Greek American, was ultimately hired as COO. However, Deno Remoundos, a Greek American, was hired immediately after the plaintiff was terminated. Although Remoundos did become Interbank's President a few months later, the plaintiff has raised a material issue of fact that Remoundos, and not Wolford, was his replacement. Given the above, the plaintiff has established a prima facie case of both age and national origin discrimination.

*2. Legitimate Reasons for Termination*

The defendants offer three reasons for the plaintiff's termination: 1) shareholder dissatisfaction with the performance of the bank; 2) the infighting among Interbank's executives; and 3) the plaintiff's unsatisfactory performance. All three of these reasons find some support in the record. See Meiri v. Dacon, 759 F.2d 989, 997 (1985) (inability to get along with co-workers is a legitimate non-discriminatory reason for discharge); Duffy, 927 F. Supp. at 594 (unsatisfactory job performance is a legitimate non-discriminatory reason for discharge).

*3. Pretext*

The plaintiff has raised a material issue of fact that the three proffered legitimate reasons for his discharge are false, and that his discharge was more likely than not motivated by discrimination.

The plaintiff has come forth with evidence that the Bank's first proffered reason for his discharge is false. The board minutes demonstrate that Bank's board anticipated substantial losses in the early stages of the Bank's operation, as they had budgeted $399 million in losses for the first quarter of 1991. As regards the second reason, the plaintiff has submitted evidence that the infighting among the managers was due primarily to Zavvos's politicking. Finally, the plaintiff has offered evidence that directly contradicts the defendants' third reason, citing two occasions on which his work was praised by Mr. Contominas, one where he was praised by a board member, and the unanimous vote to re-elect him.

*4. Discrimination*

The plaintiff has raised a material issue of fact that the defendants fired him because of his age and his national origin. Immediately following the plaintiff's termination, Kevin Barnard told the plaintiff that he was present when Mr. Kelley directed the search firm to look for someone to replace the plaintiff who was younger and of Greek ancestry.[3] In addition, Mr.

---

[3] According to the plaintiff, Mr. Barnard warned Mr. Contominas, in the presence of Mr. Kelley, that their directive to the search firm violated anti-discrimination laws. The defendants claim that this communication is privileged, and therefore cannot be considered as evidence on this motion. However, the defendants concede that the communication to the search firm is not privileged. Therefore, as the information underlying Bernard's advice was not confidential, it is unlikely, in our view, that Bernard's advice to Contominas is privileged. See Walsh v. Northrop Grumman Corp., 165 F.R.D. 16, 18 (E.D.N.Y. 1996) ("This circuit remains committed to the narrowest application of the privilege, such that it protects only legal advice that discloses confidential information given to the lawyer by the client."). As Barnard's advice is not essential

Marolla told the plaintiff that the search firm had rejected Marolla's application because he was not Greek and was too old.

The defendants have argued that these statements are inadmissible hearsay that the plaintiff cannot rely upon to defeat summary judgment. Federal Rule of Civil Procedure 56(e) requires that affidavits submitted in opposition to a summary judgment motion, "set forth such facts as would be admissible at trial." Fed. R. Civ. P. 56(e). The general rule is that hearsay evidence that would be inadmissible at trial cannot create a triable issue of fact on summary judgment. ABB Indus. Sys. Inv. v. Prime Tech., Inc., 120 F.3d 351, 357 (2d Cir. 1997). However, in Celotex Corp. v. Catrett, 477 U.S. at 324, the Supreme Court indicated that at least some forms of inadmissible evidence can be considered at the summary judgment stage: "We do not mean that the non-moving party must produce evidence that would be admissible at trial in order to avoid summary judgment." Id. In the spirit of this passage, numerous courts have found that evidence that would be inadmissible at trial may raise a material issue of fact on summary judgment, but only when that evidence can be easily rendered admissible at the trial stage. In Winskunas v. Birnbaum, 23 F.3d 1264, 1267 (7th Cir. 1994), the Seventh Circuit explained that the evidence presented by a non-movant need not be in admissible form, but the substance of the evidence must be admissible. "The evidence need not be in admissible form; affidavits are ordinarily not admissible at trial. But it must be admissible in content . . . Occasional statements in cases that a party opposing summary judgment must present admissible evidence should be understood in this light, as referring to the content or substance, rather than the form, of the submission." See McMillian v. W.E. Johnson, 88 F.3d 1573, 1584 (11th Cir. 1996); Church of

---

to our decision, we decline to decide at this stage whether it is privileged.

Scientology Flag Serv. Org. Inc. v. City of Clearwater, 2 F.3d 1514, 1530 (11th Cir. 1993); Eisenstadt v. Centel Corp., 113 F.3d 738, 740 (7th Cir. 1997); Rosensaft v. The Ashton Technology Group, Inc., 1997 U.S. Dist. LEXIS 19216, 1997 WL 749384 (S.D.N.Y.). Plaintiff intends to call both Mr. Barnard and Mr. Marolla at trial. Barnard can testify to Mr. Kelley's directions to the search firm under Rule 801(d)(2)(A) (admission of a party opponent). Mr. Marolla can also testify to what he was told by the search firm under Rule 801(d)(2)(D) (a statement by a party's agent concerning a matter within the scope of agency or employment made during the existence of the relationship). Finally, the plaintiff has also indicated his intention to call a member of the search firm to testify. Given these assurances that the facts offered by the plaintiff can easily be made admissible at trial, the Court finds that the plaintiff has raised a material issue of fact that his termination was motivated by both age and national origin discrimination. The defendants' motion for summary judgment on the plaintiff's claims of age and national origin discrimination is denied.

## B. Title VII Retaliation

Mr. Bernhardt also claims that he was fired in retaliation for hiring Ms. Markotsis and Ms. Safos. The defendants argue that summary judgment is appropriate because the plaintiff has failed to show any causal connection between his decision to hire the two women and his termination.

Title VII prohibits the firing of employees in retaliation for their opposition to discriminatory practices. 42 U.S.C. § 2000e-3(a). Retaliatory discharge in violation of Title VII occurs when "a retaliatory motive plays a part in [the discharge] . . . whether or not it was the sole cause . . . [or] when an employer is motivated by retaliatory animus, even if valid objective

reasons for the discharge exist." Cosgrove v. Sears, Roebuck & Corp., 9 F.3d 1033, 1039 (2d Cir. 1993). A Title VII retaliatory discharge claim is analyzed under the general rules set forth in *McDonnell Douglas Corp. v. Green*. Id. at 1038.

To make out a prima facie case of retaliation under Title VII, the plaintiff must show that: (1) he was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took an adverse employment action against the plaintiff; and (4) a causal connection exists between the plaintiff's protected activity and the employer's adverse action. Id. at 1039.

There is no dispute that the plaintiff has established the first three prongs of his prima facie case: he was engaged in protected activity when he hired two middle aged women based on merit; Mr. Contominas was aware of the plaintiff's role in hiring the women; and Mr. Bernhardt was ultimately fired. The defendants argue that the plaintiff has failed to establish a causal connection between his hiring of Ms. Markotsis and Ms. Safos and his termination.
A plaintiff may establish a causal connection either "indirectly by showing that the protected activity was followed by discriminatory treatment . . . or directly through evidence of retaliatory animus." Cosgrove, 9 F.3d at 1039 (quoting Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990)).

Indirect proof of a causal connection can be established by showing that protected activity "was closely followed in time by the adverse action." Manoharan v. Columbia U. Col. of Phys. & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988); see also Reed v. Lawrence, 95 F.3d 1170, 1178 (2d Cir. 1996) (inference of retaliation established when plaintiff was discharged twelve days after filing her complaint); Henderson v. Center for Community Alternatives, 911 F. Supp. 689,

702 (S.D.N.Y. 1996) (evidence of retaliation when plaintiff discharged one-and-a-half months after protesting policy).

At least eleven months passed between plaintiff's hiring of Ms. Markotsis and Ms. Safos in July of 1990, and his termination in June of 1991. While this passage of time would suggest strongly the absence of a causal link, such an inference is not, at this point, compelled by the available evidence such that the Court could resolve this claim as a matter of law. When the plaintiff hired Ms. Markotsis and Ms. Safos the Bank was in the critical start-up phase. Retaliatory action against the plaintiff at that time might have seriously jeopardized the viability of the fledgling institution. Although the question is close, it is a question of fact, beyond the authority of the Court to resolve.

### C. Claims against Mr. Contominas and Mr. Kelley

Defendants Contominas and Kelley seek dismissal of plaintiff's Title VII and ADEA claims against them on the ground that there is no individual liability under either statute. Title VII defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such a person." 42 U.S.C. §2000e(b). Despite the reference to an employer's agent, the Second Circuit has refused a literal interpretation of the statute and held that Congress intended to limit liability to employer-entities. Tomka v. Seiler Corp., 66 F.3d 1295, 1314 (2d Cir. 1995).

The ADEA similarly defines "employer" as one who is "engaged in an industry affecting commerce who has twenty or more employees . . . or any agent of such a person." 29 U.S.C. §630(b). Although the Second Circuit has not yet addressed the issue of individual liability under the ADEA, we join other district courts in following the rationale of Tomka, and conclude

that the ADEA does not generally permit individual liability. See Wray v. Edward Blank Assoc., Inc., 924 F. Supp. 498, 502-503 (S.D.N.Y. 1996); Jungels v. State Univ. College of New York, 922 F. Supp. 779, 782 (W.D.N.Y. 1996); Storr v. Anderson Sch., 919 F. Supp. 144, 146 (S.D.N.Y. 1996); Gregor v. Derwinski, 911 F. Supp. 643, 654 (W.D.N.Y. 1996). Defendants' motion to dismiss the Title VII and ADEA claims against Mr. Kelley and Mr. Contominas is granted.

**D. Separate Trials**

Having reviewed the plaintiff's proffered evidence on damages, the Court does not find that this evidence would so prejudice the defendants that separate trials are warranted pursuant to Fed. R. Civ. P. 42(b). The defendants' motion to bifurcate the trial is denied.

SO ORDERED.

Dated: Brooklyn, New York
February 3, 2009

             s/ Judge Raymond J. Dearie
             RAYMOND J. DEARIE
             Chief United States District Judge